UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**WILLIAM ROBERT BROWN**,                              Civil Case No. 3:12-CV-02005-KI

                Petitioner,

                         v.                              OPINION AND ORDER

**STATE OF OREGON,** et al.,

                Respondent.


        Thomas J. Hester
        Assistant Federal Defender
        101 SW Main Street, Suite 1700
        Portland, Oregon  97204

                Attorney for Petitioner

        Ellen F. Rosenblum
        Attorney General

Nick M. Kallstrom
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon  97301-4096

      Attorneys for Respondent

KING, Judge:

Petitioner brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254.  For the reasons below, I deny his amended petition [8] and dismiss this proceeding with prejudice.

## BACKGROUND

Petitioner lived next door to the victim, Elaine Flowers.  The two began a conversation in the hallway of their apartment complex on July 12, 2005, and petitioner followed Flowers into her apartment to continue the conversation.  Flowers asked petitioner to massage her shoulders.  He complied and the physical encounter became sexual.  Flowers testified she did not consent and tried to get away from petitioner; petitioner testified the sexual activity was consensual.  Petitioner left the apartment when Flowers told him to leave.  Flowers called her best friend, who came and took Flowers to her apartment.  The next afternoon, they called the police.

On November 10, 2005, a grand jury indicted petitioner with Unlawful Sexual Penetration in the First Degree, Sexual Abuse in the First Degree, and Attempted Sodomy in the First Degree, all by forcible compulsion.  The court dismissed the Indictment, petitioner waived a jury, and the court tried petitioner on March 15, 2006, based on an Information charging petitioner with the lesser charges of Sex Abuse in the Second Degree, without consent; Sex Abuse in the Third Degree, without consent; and Attempted Sodomy, by forcible compulsion.

Page 2 - OPINION AND ORDER

The court found petitioner guilty of all three charges and sentenced petitioner to 60 months'

probation on the conviction for Sex Abuse in the Second Degree, 6 months' incarceration with

credit for time served on the conviction for Sex Abuse in the Third Degree, and 60 months'

probation on the conviction for Attempted Sodomy.

The Oregon Court of Appeals affirmed without opinion.  Petitioner did not seek review

from the Oregon Supreme Court, so the appellate judgment issued on July 31, 2007.  Petitioner

filed a petition for post-conviction relief on January 21, 2009.  The post-conviction court denied

relief, the Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court

denied review on November 1, 2012.  Petitioner filed this habeas petition on November 7, 2012

with one ground for relief, ineffective assistance of counsel.  Although the amended petition was

unclear, petitioner clarified in his brief that he only intended to challenge the constitutionality of

the 2006 convictions, and not his 2010 conviction for Failure to Register as a Sex Offender.

**DISCUSSION**

I.      <u>"In Custody" Requirement</u>

The petitioner must be in custody for a federal court to have jurisdiction over a habeas

petition filed by a state prisoner.  <u>Zichko v. Idaho</u>, 247 F.3d 1015, 1019 (9th Cir. 2001).

Respondents argue this court does not have jurisdiction to consider petitioner's claims against the

two Sex Abuse convictions because his sentences of 60 months' probation for Sex Abuse in the

Second Degree and 6 months' incarceration with credit for time served for Sex Abuse in the

Third Degree had both expired before he filed this habeas petition.  Petitioner does not provide

any argument or explanation to the contrary.  Thus, I will only address the conviction for

Attempted Sodomy.[1]

II.    Actual Innocence

A one-year statute of limitations applies to petitioner's habeas petition.  It begins to run

on the date on which the judgment becomes final by the conclusion of direct review or the

expiration of the time for seeking direct review.  28 U.S.C. § 2244(d)(1).  The limitations period

is tolled for any period "during which a properly filed application for state post-conviction or

other collateral review with respect to the pertinent judgment or claim is pending."  28 U.S.C.

§ 2244(d)(2).

Here, the one-year limitations period began to run when petitioner could no longer seek

review from the Oregon Supreme Court, on July 31, 2007.  Petitioner had until July 31, 2008 to

file his habeas petition.  Petitioner filed his petition for post-conviction relief on January 21,

2009, nearly 18 months later.  Although the post-conviction relief filing would have tolled an

unexpired limitations period to file this habeas petition, petitioner's limitations period had

already expired.  Thus, petitioner's habeas petition is untimely.  Larsen v. Soto, 742 F.3d 1083,

1088 (9th Cir. 2013) (§ 2244(d) does not reinitialize the limitations period that ended before the

state petition was filed).  Petitioner does not dispute that his petition is untimely, but argues he

has demonstrated his actual innocence sufficiently so that the statute of limitations does not bar

this court from addressing the merits of his claim.

---

[1] At the time of filing the habeas petition, petitioner was serving a term of post prison
supervision after being found in violation of conditions of probation for the Attempted Sodomy
charge.  Thus, he is considered in custody for purposes of the court's jurisdiction over the habeas
claim concerning that conviction.  See Goldyn v. Hayes, 444 F.3d 1062, 1063 n.2 (9th Cir. 2006)
(state prisoner on parole is in custody for purposes of federal habeas relief).

In a "narrow class of cases . . . implicating a fundamental miscarriage of justice," <u>Schlup</u> <u>v. Delo</u>, 513 U.S. 298, 314-15, 115 S. Ct. 851 (1995) (internal quotation omitted), a federal court may address the merits of a habeas petition despite either a procedural bar or an expired statute of limitations.  <u>McQuiggin v. Perkins</u>, 133 S. Ct. 1924, 1928 (2013) (adding statute of limitations bar to other types of procedural bar exceptions).

> To pass through the <u>Schlup</u> gateway, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>Schlup</u>, 513 U.S. at 327.  This exacting standard "permits review only in the extraordinary case," but it "does not require absolute certainty about the petitioner's guilt or innocence."  [<u>House v. Bell</u>, 547 U.S. 518, 538, 126 S. Ct. 2064 (2006)].  "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." <u>Schlup</u>, 513 U.S. at 324, 115 S. Ct. 851.

<u>Larsen v. Soto</u>, 742 F.3d 1083, 1095 (9th Cir. 2013) (some internal quotations omitted).  The court can consider any unexplained delay in presenting the new evidence when deciding whether the petitioner has made the required showing.  <u>McQuiggin</u>, 133 S. Ct. at 1935.

A.    <u>Trial Testimony</u>

Before proceeding to the new evidence petitioner brings forward, I will summarize the trial testimony.

Flowers testified petitioner followed her into her apartment to continue a conversation. Her clothes were what she wears to bed–a big shirt or tank top, sweat pants, and no underwear. Flowers only had a single beer in the refrigerator so she gave petitioner money and asked him to go buy some more.  They each drank part of a beer while talking and watching a movie on the television.  As she often did with friends, Flowers asked petitioner to rub her shoulders.

Petitioner complied for a few minutes and began to kiss the back of Flowers' neck. Flowers tried to stand but petitioner grabbed her by the waist and pulled her down on top of him on the couch. He started groping her breasts while Flowers continued to try to pull away. Petitioner kept one hand squeezing Flowers' neck, put his other hand down her sweatpants, and put his fingers into her vagina. Flowers does not remember if she told petitioner to stop by this time, but she testified it was obvious she was trying to get away. Petitioner moved around to kneel in front of Flowers while continuing to squeeze her neck as she tried to pull his hands off. Petitioner inserted his hand down her sweatpants a second time. Then he exposed his penis and pulled Flowers' head towards it. By this point, Flowers was telling petitioner to stop. She pushed petitioner back, squirmed away from him, and stood up. Flowers told petitioner to leave, he asked why, she again told him to leave, he asked for a hug, she told him no–get out, and petitioner left the apartment.

Sounding very distraught, Flowers called a friend to come get her. Flowers was afraid to go out in the hall. She tossed her keys out the window so the friend could open the door to the secured apartment building. They soon went to the friends' apartment. The next day, the friend called the police to report the incident. Flowers was very upset and crying when she talked to the officer. Flowers stayed with the friend for two weeks; she only returned to her apartment accompanied by several friends to pack her belongings and move.

Petitioner's story is similar until Flowers asked him to give her a back rub. He testified he told her he was not comfortable doing that because it usually leads to sex. Flowers responded that she just wanted to feel like a woman, and she laid back against petitioner's chest. Petitioner started massaging Flowers' chest. She took petitioner's hand and put it into her sweatpants.

Page 6 - OPINION AND ORDER

Petitioner inserted his fingers in her vagina and then started massaging her breasts.  At some

point, Flowers asked petitioner to leave, he asked her if she was okay, and she said she was.  He

asked for a hug, she said no, he asked for a couple of beers, she said go ahead, and he took the

beers and went back to his apartment.  Petitioner testified Flowers liked the sex a lot and

climaxed.  Petitioner denies putting his hand around Flowers' neck and suggests the bruises

could have been a hickey.  He also denies removing his penis from his pants or trying to force

Flowers' head onto his penis.  Petitioner testified Flowers undid his zipper and acted as the

sexually aggressive participant in the encounter.

     B.   <u>New Evidence</u>

Petitioner points to three types of new evidence not presented at trial which demonstrate

his innocence:  polygraph results, inconsistent statements by Flowers, and petitioner's history of

cognitive deficits and brain injury

     1.   <u>Polygraph</u>

Trial counsel had polygraph examiner Derry York administer a polygraph to petitioner at

the jail on December 30, 2005 but did not present at trial the fact that petitioner passed the

examination.  Because petitioner and Flowers starkly disagreed on whether he attempted to force

Flowers to perform oral sex on him, petitioner asks this court to consider the evidence, even

though it might not have been admitted at trial.

Respondents argue a polygraph test is not the type of reliable evidence which can support

a <u>Schlup</u> actual innocence claim.

The polygraph examiner concluded petitioner was truthful when he answered "no" to the

following questions:

Page 7 - OPINION AND ORDER

(1) That night, did you try to force Elaine's mouth on your penis?

(2) On July 12, 2005, did you grab Elaine by the neck?

(3) That night last July, did you try to force your penis into Elaine's mouth?

Br. in Supp. of Pet. for Writ of Habeas Corpus Ex. F, at 1-2.

The results of a polygraph examination are generally inadmissible in court. State v. Terry, 333 Or. 163, 165, 37 P.3d 157 (2001) (polygraph test results are inherently prejudicial); State v. Lyon, 304 Or. 221, 223, 744 P.2d 231 (1987) (polygraph test results are inadmissible in Oregon state courts, even if the parties stipulated to admissibility). In concluding the per se military rule of evidence against admission of polygraph results did not violate the accused's Fifth or Sixth Amendment rights to present a defense, the Supreme Court noted, "there is simply no consensus that polygraph evidence is reliable." United States v. Scheffer, 523 U.S. 303, 309, 118 S. Ct. 1261 (1998) (collecting cases and scientific reports). I agree with other courts holding that polygraph results are not reliable enough to support a claim of actual innocence. Cortes v. Mills, No. CV09-06-TC, 2011 WL 6965804, at *5 (D. Or. July 18, 2011) (polygraph evidence is not the reliable, exculpatory evidence envisioned by Schlup).

2.    Inconsistent Statements

Officer Westberry interviewed Flowers the day after the incident, on July 13, 2005; Detective Rumble interviewed her on September 29, 2005.

Petitioner contends Flowers had several inconsistencies between her statements to investigators and her trial testimony which were sufficient for the fact finder to disregard her testimony. Petitioner claims trial counsel did not adequately cross-examine Flowers to bring out the inconsistent statements.

Page 8 - OPINION AND ORDER

Respondents argue some of Flowers' earlier statements to police were more damaging to petitioner than her testimony at trial.  They note the lapse in time between her statements to police and the trial, and argue any inconsistencies are not the type of new evidence that would prevent any reasonable juror from finding petitioner guilty.

In comparing the earlier statements with Flowers' trial testimony, there are three types of inconsistencies.  Some earlier statements left out testimony Flowers gave at trial.  She told Officer Westberry petitioner went to get beer but failed to explain she asked him to do so and provided the money.  She also told Officer Westberry petitioner left the apartment but she failed to explain she told him to leave.  Although the trial testimony is more complete than the earlier statements, the two do not contradict each other.  For example, Flowers never denied to Officer Westberry that she sent petitioner out for beer with her money.  There is no indication Officer Westberry asked for that much detail.  Flowers did give this information to Detective Rumble, who likely asked many more questions than Officer Westberry based on the length of their two reports.  This type of inconsistency would not cause a reasonable juror to disregard Flowers' trial testimony, even if pointed out during cross-examination.

Other earlier statements are less vague than the trial testimony.  Flowers told Officer Westberry she tried to scream but petitioner was choking her.  She told Detective Rumble she told petitioner "no" or "stop" or "don't" several times before he reached into her sweatpants.  At trial, Flowers testified petitioner had a strong grip around her neck, causing bruising, but did not say she was choked, and she could not remember precisely when she first started yelling at petitioner.  Flowers told Officer Westberry she was sore around her vagina and told Detective

Page 9 - OPINION AND ORDER

Rumble she later saw bruising on her vaginal area as a result of petitioner's actions.  She said nothing about this at trial.

Again, these types of inconsistencies, even if brought out during cross-examination, would not cause a reasonable juror to disbelieve Flowers.  Over two months passed between the incident and Detective Rumble's interview with Flowers; another five months passed before the trial.  Memories fade over time, making it likely that trial testimony about when and what Flowers yelled would be more vague than the prior statements to investigators.  The difference between petitioner choking Flowers and having such a strong grip on her neck that she could not break free is minimal.  Both described actions that could leave bruise marks on Flowers, corroborating either explanation.  Finally, Flowers was not asked at trial about some of the information she provided in the earlier statements, such as the soreness and bruising around her vagina.  These types of inconsistencies do not give much support to petitioner's argument.

Two of the earlier statements, however, are actually inconsistent with Flowers' trial testimony.  First, Flowers told Officer Westberry she did not want petitioner to rub her shoulders but did not say anything to stop him.  At trial, Flowers testified she asked petitioner to rub her shoulders.  Second, Flowers told Officer Westberry she was uncomfortable with petitioner in her apartment.  At trial, Flowers testified she did not feel bad about petitioner entering her apartment, then said she was uncomfortable whenever petitioner came over.  Defense counsel could use these inconsistencies to try to discredit Flowers, and actually tried to do so concerning whether Flowers told the officer she was uncomfortable with petitioner in her apartment.  Flowers, however, could not remember what she had told the officer due to the lapse in time.

Page 10 - OPINION AND ORDER

Even if these two inconsistencies were clearly brought out to jurors, though, they would balance the inconsistencies with numerous things corroborating Flowers' trial testimony. To name a few: (1) she was very consistent in her description of petitioner pulling her down on his lap when she tried to get away from his kissing, petitioner groping her breasts, petitioner inserting his fingers into her vagina, and petitioner exposing himself and trying to force her head down for oral sex; (2) her neck was bruised; (3) she would not go into the hallway to let her friend into the building and tossed her keys down from the window; (4) she left the apartment that night and only returned to pack up and move; and (5) she was extremely distraught when her friend arrived and when Officer Westberry interviewed her the next day.

Moreover, defense counsel cross-examined Flowers about many topics, including whether she had ever dated a black man (petitioner is black), whether she mingled with other people when she was dressed for bed, whether she told a police officer she was uncomfortable when petitioner came into her apartment, why she did not lock petitioner out when he went for the beer, whether sending someone for beer and then asking them to rub your shoulders could give off a different signal than intended, why Flowers did not tell the officer she discussed boyfriend problems with petitioner, whether she was comfortable with asking near-strangers to rub her shoulders, and why Flowers did not call 911 immediately to report a sexual assault. Despite the pointed questions, Flowers remained consistent in her description of the incident.

I conclude no reasonable juror would disregard Flowers' version of the events, even if presented with what petitioner portrays as earlier inconsistent statements.

3.    Petitioner's History of Cognitive Deficits and Brain Injury

Petitioner notes trial counsel did not present evidence of petitioner's history of cognitive deficits and brain injury, both of which are relevant to proving if petitioner had the required culpable mental state.

Respondents note petitioner did not cite to any passage in his medical records which would indicate he was unable to understand that Flowers did not consent to his conduct.

Petitioner underwent several psychological and physical exams, some as part of his application for Social Security disability benefits.  A few years before the incident, petitioner was in an automobile crash in 2003.  After the incident but before being contacted by police, petitioner was admitted to the psychiatric ward in St. Vincent Medical Center for a week in August 2005.  Just prior to trial, a psychologist, Dr. Kitch, performed a psychosexual evaluation in February 2006.  After trial, another psychologist, Dr. Givi, examined petitioner on October 19, 2006, and Dr. Houle, M.D., petitioner's healthcare provider, treated him from February through July 2009.

The medical records indicate Brown has a history of depression, anxiety, three head injuries, memory problems, extreme reading difficulties, and he attended special education classes throughout school.  The records also show Brown's comprehension of language is much higher than his ability to read, he could place events in sequential order even though he could not say when events happened, his basic receptive and expressive language functions were at the low end of normal limits, and there was no evidence of a thought disorder.  In short, although Brown has some cognitive and psychological problems, there is no evidence in the medical records he would have any difficulty understanding that Flowers did not want to have sexual contact with

him by her attempts to stand up and move away from him, pull his hands from her neck, and her eventual statements of "no" and "stop."  The medical records do not demonstrate it is more likely than not that no reasonable juror would have convicted petitioner.

        4.    <u>Summary</u>

The cases in which a habeas petitioner is allowed to pass through the <u>Schlup</u> gateway, allowing the federal court to address the merits of the petition, discuss much more compelling evidence that the petitioners were not guilty.  For example, the petitioner in <u>Larsen</u>, 742 F.3d 1083, was convicted of possession of a deadly weapon.  After being called to a bar fight, the officers testified they saw Larsen pull a five or six inch long linear object from his waistband and throw it under a car.  They found an illegal knife under a pickup.  <u>Id.</u> at 1086-87.  To pass through the <u>Schlup</u> gateway, Larsen provided declarations from a retired police officer and his wife who were in the parking lot of the bar with their son.  According to the couple, a man nicknamed Bunker was arguing with their son, reached into his waistband when the police arrived, and threw something that looked like a knife under the car to the left of the couple's son's car.  The couple stated Larsen had nothing in his hands, made no movements, and did nothing warranting arrest.  <u>Id.</u> at 1087.  Larsen also filed a declaration from Bunker's girlfriend stating Bunker admitted tossing his knife under a truck.  The girlfriend explained Bunker sold his motorcycle to bail Larsen out of jail because he felt responsible for Larsen being arrested.  Bunker also provided a declaration stating the knife was his, and he did not testify because no one subpoenaed him.  <u>Id.</u> at 1088.

In contrast, petitioner here relies on the results from a polygraph test which are inadmissible at trial, allegedly inconsistent statements from the victim which lack persuasive

Page 13 - OPINION AND ORDER

power, and medical records showing petitioner has cognitive and psychological problems but which fail to show he is impaired in understanding speech or expressive actions.  For this reason, I conclude petitioner has not shown it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.  Thus, petitioner does not pass through the Schlup gateway, and I cannot address the merits of his habeas petition because it is untimely.

## CONCLUSION

I deny petitioner's amended petition [8] and dismiss this proceeding with prejudice. Because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is denied.  See 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

Dated this _____5th_____ day of November, 2014.

_/s/ Garr M. King_____
Garr M. King
United States District Judge

Page 14 - OPINION AND ORDER